IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| LILLIAN GRACE PETH, | ) | CASE NO. 3:18-CV-2845 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Lillian Grace Peth ("Peth") seeks judicial review of the final decision of

Defendant Commissioner of Social Security ("Commissioner") denying her application for

Supplemental Security Income ("SSI"). Doc. 1. This Court has jurisdiction pursuant to 42

U.S.C. § 405(g). This case is before the undersigned Magistrate Judge pursuant to the consent of

the parties. Doc. 11.

As explained below, the ALJ did not sufficiently set forth either her reasoning or the

record evidence relevant to her determination to give only partial weight to some of the opinion

evidence. As a result, the Court is unable to determine whether her RFC assessment is supported

by substantial evidence. Accordingly, the Commissioner's decision is **REVERSED and**

**REMANDED** for proceedings consistent with this opinion.

## I. Procedural History

Peth protectively filed her application for SSI in December 2015, alleging a disability

onset date of April 23, 2015. Tr. 12, 175. She alleged disability based on the following:

dissociative identity disorder, unspecified depression disorder, and anxiety. Tr. 181. After

denials by the state agency initially (Tr. 72) and on reconsideration (Tr. 86), Peth requested an

1

administrative hearing (Tr. 102). Shortly before her hearing, Peth amended her alleged onset date to December 30, 2015. Tr. 175. A hearing was held before an Administrative Law Judge ("ALJ") and, on December 13, 2017, the ALJ determined that there are jobs that exist in significant numbers in the national economy that Peth can perform, i.e. she is not disabled. Tr. 24-25. Peth requested review of the ALJ's decision by the Appeals Council (Tr. 159) and, on October 12, 2018, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner. Tr. 1-3.

## II. Evidence

### A. Personal and Vocational Evidence

Peth was born in 1997 and was 18 years old on the date she filed her application. Tr. 24. She graduated from high school and has no work experience. Tr. 37-38.

### B. Relevant Evidence

On April 17, 2015, Peth's grandparents brought her to the emergency room after noticing that she had self-inflicted cuts and scratches and was hitting herself in the face. Tr. 277. They reported that she had a history of depression and anxiety and Peth reported that her anxiety had gotten worse and that she had frequent blackouts and did not remember self-harming. Tr. 277. She was transferred to Rescue Crisis, where she was hospitalized for two days for crisis stabilization. Tr. 439, 580, 583. She was noted to have carved insulting words on her legs. Tr. 583, 343. She was prescribed Zoloft and her symptoms improved. Tr. 342-342, 337.

On April 23, 2015, Peth began outpatient treatment at Unison Behavioral Healthcare. Tr. 439. After an assessment, she was diagnosed with dissociative identity disorder and unspecified depressive disorder. Tr. 444. The next day she began counseling with licensed social worker Jeni Mills. Tr. 392.

On May 11, 2015, Mills noted that Peth "switched to 'Georgia' when [she] began discussing and identifying why she despises her ½ brother . . . 'Georgia' reports when the body feels fear she is the 'protector' of the body. Client did not return to the session. 'Georgia' reported she would give client an appointment card with client's next appointment date on it." Tr. 399. On May 29, Peth said she was not switching personalities as often and explained that she would hit herself in the head to keep herself from switching. Tr. 337.

On June 2, 2015, Peth saw Mills and reported that she was no longer switching personalities in class at school and that she had been transferred to a quieter classroom. Tr. 437. Mills observed that, during the session, "Client switched to 'Mora.' Mora is a young child, speaks in a softer tone, rocks back and forth curls up in a fetal position. Mora discussed at length a time where boys used sticks to sexually abuse her. Client was tearful as she described the incident. Writer provided reassurance that she was safe and that no one was harming her and normalized 'Mora's' fears. Client switched to Lilly and was reassured she was safe." Tr. 437.

On June 16, 2015, Peth saw David Szymanski, M.D., for a neurological evaluation. Tr. 304. Dr. Szymanski ruled out a neurological cause for her dissociative symptoms. Tr. 305. He stated that neither he nor Peth's prior psychiatrist thought multiple personalities was a legitimate disorder, but that Peth will certainly need psychiatric management. Tr. 305.

On July 1, 2015, Peth saw psychiatrist Jaylata Patel, M.D., for a psychiatric evaluation at Unison. Tr. 445-447. She reported that she had previously done very well in school; her grades had gone down; and her grades had improved in the last three months since she had an IEP and was put into smaller classes. Tr. 446. Dr. Patel diagnosed dissociative identity disorder and depressive disorder and continued her Zoloft as she was doing well on it. Tr. 447. Dr. Patel also sent Peth for psychological testing to clarify the dissociative identity diagnosis. Tr. 447, 587.

On July 7, 2015, Peth saw Mills and reported an anxiety attack after viewing a "'fake' family photo." Tr. 407. Peth also recalled previous trauma when she was 12 years old, switching to her "Georgia" personality and discussing a rape and pregnancy. Tr. 407.

On August 12, 2015, Peth saw Dr. Patel and stated that she was getting better. Tr. 380. She reported two or three panic attacks in a store and at church when she could not find her grandmother; she had found her grandmother and then was okay. Tr. 381.

On August 12 and 27, 2015, Peth had a psychological evaluation with psychologist Larry Hamme, Ph.D., upon referral from Dr. Patel. Tr. 587-596. Peth identified at least four personalities. Tr. 588. She indicated that loud, sudden noises triggered switching to other personalities and she had been told that her voice and mannerisms changed when her personality switched. Tr. 588. She described seeing unrecognizable writings in her diary, marks of self-injurious behavior that she does not remember inflicting, and projects that she had been working on were suddenly completed. Tr. 588. Counseling had helped her deal with these personalities and repeating a word or counting out loud sometimes helped avoid switching personalities. Tr. 588-589. She recounted prior sexual abuse. Tr. 590-591. She reported that she enjoys drawing, painting, sewing, making jewelry, cooking and playing musical instruments. Tr. 589. She described her difficulties in large classrooms in school, including failing classes, and stated that, since being transferred to classes with only five other students and receiving tutoring, her academic performance had improved. Tr. 589.

Peth's Wechsler Adult Intelligence Scale (fourth edition) results were generally average, including in working memory and long-term memory, with her lowest score in processing speed, which, Dr. Hamme opined, was likely linked to her depression and anxiety. Tr. 595. Thus, Dr. Hamme stated, she "may face major challenges maintaining focused attention and concentration

under time constraints." Tr. 595. On the Minnesota Multiphasic Personality Inventory (second edition) test, Peth had significantly elevated scores in several areas; her scores were deemed valid in light of her history of depression, anxiety, trauma, alcohol and drug use, sexual abuse, and emotional abuse. Tr. 594, 595. Dr. Hamme diagnosed dissociative identity disorder and an unspecified depressive disorder, with recommendations to continue counseling for her self-injurious behavior and personality switching, to learn coping skills, and to continue in a small classroom, as larger classrooms would likely cause significant distress and increase the likelihood of personality switching. Tr. 594, 596.

On September 1, 2015, Peth reported that she was switching personalities more often and her anxiety had worsened since school started. Tr. 326.

Peth's IEP for the fall 2015 school year provided for small group instruction in a resource room in order to maintain her safety and permitted her to see a counselor as needed to decompress. Tr. 241, 521. She was given extended time on assignments and was allowed to take frequent breaks. Tr. 236. Her teachers had observed Peth's other personalities and witnessed her hitting herself to make voices go away. Tr. 512, 513, 515. One teacher reported that Peth was "great" academically and "generally pretty good" behaviorally. Tr. 512. She discussed strange topics in class and sometimes crossed the line, but when asked to move on she complied. Tr. 512. "Her behavior never seems to affect her work ethic and she always works very hard and completes her assignments." Tr. 512; see also Tr. 513, 514, 515 (other teachers describing Peth's propensity to discuss strange topics or overshare and her ability to complete assignments well and in a timely manner).

On September 23, 2015, Peth saw Dr. Patel and reported that she was getting better and that school was going well. Tr. 383. She had plans to go to an anime convention with a friend.

Tr. 383.

On October 15, 2015, Peth saw a nurse for a medication refill. Tr. 388. She reported that she felt good, had decreased anxiety with her medications, and denied feeling depressed. Tr. 388.

On November 4, 2015, Peth saw Dr. Patel and stated that she felt fine and school was going well. Tr. 379. She had gone to the anime convention with her sister and liked it. Tr. 379. She had gone to her uncle's wedding in Tennessee and had had a good time. Tr. 379, 377. On December 16, Peth reported looking forward to having fun over the holidays and visiting her younger sister when she came into town. Tr. 377. Upon exam, she was mostly normal—a happy mood; intact memory, attention, and concentration; and fair insight and judgment. Tr. 377.

On January 14, 2016, Peth saw her general practitioner and reported rarely switching to another personality. Tr. 310. She stated, "I know how to deal with this better now." Tr. 310.

On January 20, 2016, Peth saw Dr. Patel; she felt good and did not report any problems. Tr. 375. She had a good holiday season and reported being on track to graduate in the summer. Tr. 375. She read, did arts and crafts, talked to friends, and went out with her grandparents. Tr. 375.

On January 25, 2016, one of Peth's teachers completed a questionnaire on behalf of Peth, noting that she required being in small groups designed to maintain her safety and the safety of other students. Tr. 208. The teacher stated that Peth did not frequently miss school. Tr. 208. Although the questionnaire provided five pages of check-box areas for the teacher to rate Peth's abilities, three of the pages were not filled out and at least one page includes comments that refer to a student other than Peth. Tr. 205.

On February 21, 2016, state agency reviewing psychologist Marjorie Kukor, Ph.D.,

reviewed Peth's record. Regarding her RFC assessment, Dr. Kukor opined that when Peth's symptoms are severe she will need flexibility in scheduling work and break periods. Tr. 68. She could complete 1-5 step tasks, may need reminders for more complex instructions, would work best with a small number of co-workers or by herself on an individual project, and would need additional supervision when first learning new tasks and "clear explanations when getting feedback from supervisors." Tr. 68-69. She could have brief, superficial interactions with others, including co-workers and supervisors and, when her symptoms are severe, she will need flexibility to work by herself or with a small number of co-workers. Tr. 69. She would need major changes previewed and gradually introduced to give her time to adapt to new expectations and major goals and decisions would need to be reviewed by supervisors prior to implementation. Tr. 69.

On March 9, 2016, Peth saw Dr. Patel. Tr. 461. She reported anxiety and one panic attack. Tr. 461. She had a boyfriend, was seeing a new friend, socializing, making friends, and enjoyed art club. Tr. 461. She wanted something for her anxiety and Dr. Patel added Buspar. Tr. 461. Later that day she saw Mills. Tr. 471. During the session, "Georgia" came out, they discussed matters, and then Peth returned at the end of the session. Tr. 471.

On March 22, 2016, Peth saw Mills and reported that her grandmother had just had foot surgery. As a result, Peth was responsible for cooking, cleaning, and grocery shopping. Tr. 463. She reported being mean to her friends and they discussed her self-destructive behaviors. Tr. 463. Upon exam, she was pleasant, cooperative, and calm, with a stable mood, adequate concentration, intact memory, and reported auditory hallucinations. Tr. 463. On March 31, 2016, Peth told Mills that she had attended an anime event and informed security that there was a person there she has had difficulty with and who was on the sexual offender registry. Tr. 475.

Mills applauded her for her appropriate use of boundaries and self-care. Tr. 475. Peth reported that she had begun looking for her own apartment in the community. Tr. 475.

On April 13, 2016, Peth saw Dr. Patel and reported that she sometimes hears things in her head; it is not like a "real voice" and it does not affect her. Tr. 459. School continued to go well and she was going to prom. Tr. 459. Dr. Patel offered to add Abilify to her medication, but Peth declined and stated that she was coping fine. Tr. 459.

On April 18, 2016, Peth saw Mills and reported that she went to prom, which was "awesome," and she had not experienced anxiety. Tr. 479. She reported that on the way to the restaurant before prom, "'Calvin' came out lit a cigarette and burned my friend with it." Tr. 479.

On April 27, 2016, Peth saw Mills and showed her a superficial cut on her right forearm and a photo of the word "freak" and other cut marks on her left leg that were deeper and which Peth was treating with ointment and bandages. Tr. 483. These cuts had been made the day before by "Georgia." Tr. 483, 486.

On May 13, 2016, Mills completed a medical source statement on behalf of Peth. Tr. 584-586. Mills opined that Peth could consistently understand, remember and follow detailed and complex instructions; she explained that Peth had stated, "I can do any of these, my alters cannot." Tr. 584. She would require close supervision in order to stay on task and would be off task 20% or more of the work day, explaining that Peth would "need time to communicate with my alters without interruption." Tr. 584. She would be absent, late, or leave early at least once a week due to what Peth described as buzzing noises when her alters got too loud. Tr. 584. She could occasionally interact superficially with coworkers and supervisors but would not be successful interacting with the public. Tr. 585. Mills did not rate Peth's ability to maintain pace but explained that Peth stated that she does not do very well with time limits. Tr. 585. In sum,

Mills stated that Peth's alters greatly impacted her daily functioning, and that communication with her alters was "essential to continue with Ms. Peth's involvement in the workplace and in her daily environment." Tr. 586. She stated that Peth was beginning to adjust and learn communication skills with her alters in order to help her "adapt to life's social, personal, work, and family interactions." Tr. 586.

On May 18, 2016, state agency reviewing psychologist, Cindy Matyi, Ph.D., opined that Peth could carry out simple and occasionally complex tasks, maintain attention, make simple decisions, and adequately adhere to a schedule. Tr. 82. She would need some flexibility in terms of time limits and production standards and additional supportive supervision when first learning a task. Tr. 82-83. She could relate adequately on a superficial basis in an environment that entails infrequent public contact and minimal stressors and could adapt to settings in which duties are routine and predictable and changes are well-explained and introduced slowly. Tr. 83.

On May 25, 2016, Peth saw Dr. Patel; her mood was okay and she was planning on going on vacation. Tr. 540. Dr. Patel discussed transferring Peth to an adult psychiatrist. Tr. 540.

On June 7, 2016, Peth saw Mills and reported that she had just graduated from high school. Tr. 538. She had left her grandparents home and had stayed with various friends for four days before returning. Tr. 538. Upon exam, she had a stable mood, appropriate affect, good eye contact, was cooperative, had adequate concentration and intact memory, controlled perceptual disturbances, and she reported auditory hallucinations. Tr. 538.

On August 3, 2016, Peth saw Dr. Patel and reported that she didn't think the medications were working well. Tr. 543. She had moved out of her grandparents' home again and was staying with a friend. Tr. 543. Her alters were making noises, which bothered her. Tr. 543. Dr.

Patel continued her Buspar, increased her Zoloft, and added Risperdal.  Tr. 543.  On August 31, Peth reported that she felt much better since adding Risperdal.  Tr. 545.  Her mood was stable, her anxiety had improved significantly, and she did not hear noises anymore.  Tr. 545.  She was applying for jobs and had had some interviews.  Tr. 545.  They again discussed transferring her care to an adult psychiatrist.  Tr. 545.

On February 1, 2017, Peth saw mental health clinical nurse specialist Kelly Kinsey at Unison as a walk-in patient.  Tr. 547-548.  Peth reported that, while she had been living with her grandparents and taking her medication, she had been going to school and doing well.  Tr. 547.  But when she had moved out of her grandparents' home and in with a friend, whom she was afraid of, she had stayed in her room and stopped taking her medications.  Tr. 547.  She reported that Calvin, one of her personalities, told her that she was being followed and that he couldn't protect her if she took her medications.  Tr. 547.  She had restarted her medications about a week prior to her visit.  Tr. 547.  She had recently returned to her grandparents and stated that she does better with them.  Tr. 547.  She was going to be vacationing with them for six weeks.  Tr. 547.  Upon exam, she had rapid speech; was cooperative and engaged; had an okay mood and intact memory, attention and concentration; no hallucinations; and fair insight and judgment.  Tr. 547-548.  Kinsey continued Peth's Buspar and Zoloft and increased her Risperdal.  Tr. 547.  Kinsey planned injections of Invega when Peth returned from her vacation and added the diagnosis of rule out schizophrenia.  Tr. 547-548.

On May 2, 2017, Peth returned to Unison and saw board-certified mental health clinical nurse specialist Lori Gozdowski.  Tr. 549-550.  Peth stated that her paranoia had improved with Risperdal but her Zoloft was not helping her depression.  Tr. 549.  She was not in therapy.  Tr. 549.  She stated, "everything is fine in my life, I don't know why I'm depressed and thinking

about dying." Tr. 549. Her mental status exam was similar to her previous exam. Tr. 549. Gozdowski added Wellbutrin and started Invega injections. Tr. 549-550.

On July 13, 2017, Peth began attending group therapy for binge eating. Tr. 598.

### C. Testimonial Evidence

#### 1. Peth's Testimony

Peth was represented by counsel and testified at the administrative hearing. Tr. 33. She has been living with her boyfriend for the past three months. Tr. 37. She met him at a birthday party about four months prior to the hearing. Tr. 37. Peth testified that she graduated from high school and attended regular classes, but she had a classroom she would go to for breaks from the crowd and noise where she would work more silently. Tr. 38. She went to this room every day for about three hours total each day. Tr. 38.

Peth has applied for jobs (at a grocery store, a market, a retail clothing store, and a coffee shop), but every time she gets an interview she has a dissociative episode and misses it. Tr. 39. She mostly fills out applications online, but she has also walked into a place and asked for an application. Tr. 40. When asked whether she could perform work at a grocery store if she were offered a job there, Peth answered, "I don't think so at this point." Tr. 40. She explained, "every time I'm in public, my anxiety level shoots up to a point where I have to constantly count and constantly recalibrate myself." Tr. 40. She counts backwards from 20 in her head and then forwards again. Tr. 40-41. Also, being around people makes her nervous and upset. Tr. 41. When she hears loud, sudden noises, like someone clapping their hands or someone dropping a book, she tends to freak out. Tr. 41. She has panic attacks and she can't stay in that place and she has to flee. Tr. 41. When she has a panic attack, it feels like there is a rock on her chest and she can't catch her breath. Tr. 41. She starts breathing very heavily and rocking back and forth.

Tr. 41.  She hears a loud buzzing sound in her head that doesn't go away; it gets louder and louder and she wants to plug her ears and curl up into a ball.  Tr. 41.  Sometimes she screams over the noise.  Tr. 41.  She has a panic attack every couple of days usually, whenever she is in public.  Tr. 41.  It is rare that she can go out in public without a lot of preparation.  Tr. 41.  She needs a good night sleep prior to the day she goes out and she has to do breathing exercises before she leaves the house and a lot of counting exercises so that she knows she is safe.  Tr. 41-42.  She does not have a driver's license and has never tried to get one because she does not think she would be safe to drive.  Tr. 42.  She has never taken public transportation and normally her grandparents or her boyfriend's mother drive her around.  Tr. 42.

On a typical day, Peth wakes up and has to alleviate some of her anxiety and suicidal thoughts by doing a lot of breathing exercises first thing in the morning.  Tr. 42.  Then she will try to cook something or clean something so that she can be productive.  Tr. 43.  She does household chores throughout the day.  Tr. 43.  She tries to go outside and get a little air, take a little walk, and get some exercise.  Tr. 43.  By the time she finishes all the chores and gets herself centered, her boyfriend comes home from work.  Tr. 43.  Then she has a couple of hours of feeling balanced, relaxed, healthy, and normal, before going to bed.  Tr. 43.  When she lived with her grandparents she spent most of the time alone, locked in her room.  Tr. 43.  Currently, she sees her grandparents every couple of days; usually, they pick her up and take her to their house.  Tr. 43.  There is not really anyone else she sees on a regular basis.  Tr. 44.

Peth is not in counseling because she missed a lot of appointments due to several dissociative episodes and her counselor closed her case about six months ago.  Tr. 44.  She still sees a medical provider who prescribes her medication; she is currently taking injectable and oral Abilify, Buspar, and Zoloft.  Tr. 44.  She does not experience side effects from these

medications.  Tr. 44.

About once a month, Peth walks to the library.  Tr. 45.  She does not go by herself; she usually has to have someone hold her hand so she feels more grounded.  Tr. 51.  She goes there to get movies and she reads books on her phone.  Tr. 45.  She uses an app to download the books and reads maybe 15 books a month.  Tr. 45.  She doesn't have problems following the plots of movies or books, although sometimes she will have to rewind or go back and read what she just read.  Tr. 45.  When asked if she has problems completing a household chore that she started, Peth answered yes and stated that she will get lost in the middle of a task and have to restart.  Tr. 46.  For example, when she does dishes she puts the clean dishes on one side and the dirty dishes on the other side, and she will forget which side is which and have to start all over.  Tr. 46.  She does the grocery shopping but usually goes with her boyfriend.  Tr. 46.  She doesn't like being in the store by herself and has to hold onto him or hold his hand when she is in the store.  Tr. 46.  She gets anxious being around others in the store and just wants to flee as quickly as possible.  Tr. 47.  She has this problem in most other public places: baseball games when she tries to go, an amusement park, and a museum.  Tr. 47.  She has to leave these places early because of anxiety.  Tr. 51-52.  To relieve her symptoms, she does lots of counting and breathing exercise.  Tr. 47.  These exercises help when she is in public but then she thinks about how weird she looks doing her breathing exercises and that makes her anxiety worse.  Tr. 47.  She interacts with others using social media.  Tr. 48.  She also plays games on her phone and texts people.  Tr. 48.

When asked how often she goes to events like birthday parties, Peth answered that she goes very infrequently, maybe once a month.  Tr. 49.  She tries to get together with friends once a week, but they have to come to her.  Tr. 49.  Her hobbies include making jewelry and she likes to sketch, paint and color.  Tr. 49.  About five months prior to the hearing, she took a six-week

vacation with her grandparents.  Tr. 49.  They drove to Texas and Peth visited family members, sat by the pool, saw some sights, and took pictures of cows.  Tr. 49.  The sights she saw were mostly nature sights, like bird observation parks, and they were not very crowded.  Tr. 50.

Peth stated that she has trouble following verbal directions and will get lost in the middle of small tasks and have to restart.  Tr. 52.  When asked what is distracting her, Peth stated, "mostly things in my head."  Tr. 52.  These are voices of the other people that live within her head.  Tr. 52-53.  She has trouble with her memory; she notices that there are long periods of time she doesn't remember or just has "a complete black on."  Tr. 53.  These are the times she assumes she is dissociative.  Tr. 53.  She can tell that she has lost time when she sees a clock or the sun is in a different location; sometimes she wakes up in different places wearing different clothes, or she tastes things in her mouth like gum or candy.  Tr. 43.  When she is not having a dissociative episode, she occasionally has problems with her memory.  Tr. 53.

### 2. Vocational Expert's Testimony

A Vocational Expert ("VE") testified at the hearing.  Tr. 53-62.  The ALJ asked the VE to determine whether a hypothetical individual of Peth's age and education could perform work if that person had the limitations assessed in the ALJ's RFC determination, and the VE answered that such an individual could perform the following jobs that exist in significant numbers in the national economy: janitor, laundry worker, and detailer.  Tr. 55-56.

### III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which

can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

 In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1. If claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[1] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

---

[1] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 *et seq*.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 *et seq*., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the vocational factors to perform work available in the national economy. *Id.*

### IV. The ALJ's Decision

In her December 13, 2017, decision, the ALJ made the following findings:

1. The claimant has not engaged in substantial gainful activity since December 30, 2015, the application date. Tr. 14.

2. The claimant has the following severe impairments: dissociative identity disorder; major depressive disorder; and obesity. Tr. 14.

3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. Tr. 15.

4. The claimant has the residual functional capacity to perform medium work as defined in 20 CFR 416.967(c) except: limited to simple tasks that are not fast paced meaning the pace of productivity is not dictated by an external source over which the claimant has no control; only occasional interaction with coworkers and supervisors, but no tandem tasks and no responsibility for conflict resolution; no interaction with the public and work in proximity to only a small number of coworkers (meaning less than 10); and limited to a work routine that is repetitive from day to day with few and expected changes. Tr. 17.

5. The claimant has no past relevant work. Tr. 24.

6. The claimant was born in 1997 and was 18 years old, which is defined as a younger individual age 18-49, on the date the application was filed. Tr. 24.

7. The claimant has a limited education and is able to communicate in English. Tr. 24.

8. Transferability of job skills is not an issue because the claimant does not have past relevant work. Tr. 24.

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform. Tr. 24.

10. The claimant has not been under a disability, as defined in the Social Security Act, since December 30, 2015, the date the application was filed. Tr. 25.

## V. Plaintiff's Arguments

Peth argues that the ALJ's RFC assessment is not supported by substantial evidence because the ALJ erred when evaluating the opinion evidence and ignored evidence in the record. Doc. 12, p. 1.

## VI. Legal Standard

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.,* 889 F.2d 679, 681 (6th Cir. 1989) (per curiam) (citations omitted)).  A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

## VII. Analysis

Peth argues that the ALJ's reasons for discounting the opinion evidence does not describe a nexus between the ALJ's cited reasons and the ability to sustain work.  Doc. 12, pp. 17-21 (discussing the opinions of Mills and the state agency reviewers).  The Court agrees.

The ALJ gave all the opinion evidence regarding Peth's mental impairments "partial" weight.  With respect to Mills's opinion, the ALJ set forth the limitations assessed by Mills as follows: Peth would need close supervision while performing tasks, she would be off-task 20% of the workday and miss more than three days per month due to her symptoms, she would need

time to communicate with others, she would be unable to successfully work with the public, and she could occasionally maintain superficial interaction with coworkers and supervisors. Tr. 20. The ALJ concluded,

> The undersigned gives only partial weight to the opinion of Ms. Mills. In making this finding, the undersigned notes that the opinion of Ms. Mills is somewhat inconsistent with the claimant's reported activities of daily living, which suggest no more than moderate limitations in activities of daily living and social functioning. However, the undersigned notes that the opinion of Ms. Mills is generally consistent with treatment notes from Unison, which indicate a history of dissociative disorder, anxiety, and depression. Therefore, based upon the foregoing, the undersigned gives only partial weight to Ms. Mills' opinion.

Tr. 20-21. Although Mills, a social worker, is not an acceptable medical source, the ALJ "generally should explain the weight given" to Mills's opinion "or otherwise ensure that discussion of the evidence in the determination or decision allows a claimant and subsequent reviewer to follow the adjudicator's reasoning[.]" *Noto v. Comm'r of Soc. Sec.*, 632 Fed. App'x 243, 249 (6th Cir. 2015) (quoting SSR 06-03p, 2006 WL 2329939, at *6).

It is not clear what limitations the ALJ gave "partial" weight to and her reasons for doing so. It appears that, based on the ALJ's RFC assessment, the ALJ did not credit the portion of Mills's opinion that limited Peth to requiring close supervision while performing tasks, being off-task 20% of the workday, and missing more than three days per month due to her symptoms. The only explanation the ALJ provides is that these limitations are "somewhat inconsistent with the claimant's reported activities of daily living, which suggest no more than moderate limitations in activities of daily living and social functioning." But the ALJ does not detail Peth's reported activities of daily living in her explanation, and the activities the ALJ referenced earlier in her decision do not support the ALJ's conclusion.

Earlier in her decision, at step three, the ALJ stated that Peth's activities of daily living included the following "leisure activities": jewelry making, sculpting, painting, playing video

games, doing some multi-step household chores, and managing her own money and medication.

Tr. 15-16. Later in her decision, the ALJ observed that Peth spent her free time reading, doing

crafts, and talking with friends. Tr. 19. These activities do not (necessarily) negate Mills's

finding that Peth would be off-task 20% of the workday and miss more than three days per

month due to her symptoms. In short, the evidence cited by the ALJ, without further

explanation, does not support her conclusion.

Peth also argues that the ALJ's reference to the Unison treatment notes when discussing

Mills's opinion was not specific enough. Doc. 12, pp. 20-21. The Court agrees. The ALJ stated

that Mills's opinion "is generally consistent with treatment notes from Unison, which indicate a

history of dissociative disorder, anxiety, and depression." Tr. 20-21. This non-specific

statement does not aid the Court in understanding the ALJ's finding regarding the precise

limitations assessed by Mills. And the ALJ's discussion of the Unison treatment notes elsewhere

in her decision is not specific enough to bolster the ALJ's reference to the notes when discussing

Mills's opinion. Peth's contention that the ALJ cherry-picked the evidence from Unison

discussed elsewhere in her decision is well-taken. Doc. 12, pp. 20-21. The evidence the ALJ

cited (from Peth's visits to Unison) does not discuss her dissociative episodes. Although the ALJ

is not required to discuss every dissociative episode in detail, the ALJ did not discuss any

dissociative episodes and glossed over significant aspects of the treatment notes. For example,

the ALJ stated that an April 2016 treatment note showed that Peth was able to attend prom

without episodes of anxiety or psychosis. Tr. 19. While true that Peth reported she attended

prom with no anxiety, she also reported an episode of apparent psychosis: she stated that on the

way to the restaurant before prom, "'Calvin' came out lit a cigarette and burned my friend with

it." Tr. 479. Nine days later Peth saw Mills and she had self-inflicted cut marks on her arm and

leg, made by her alter "Georgia" the day before. Tr. 483, 486. The ALJ does not mention these episodes. Nor does the ALJ acknowledge the fact that Peth went off her medications sometime prior to February 2017, reporting that "Calvin" told her that she was being followed and that he couldn't protect her if she took her medications. Tr. 547. Rather, the ALJ simply stated that Peth's progress notes "through 2017 show that her symptoms of paranoia and anxiety was improving[.]" Tr. 19-20. In short, the ALJ's recitation of treatment notes from Unison does not accurately describe Peth's condition and the reference to these notes in her discussion of Mills's opinion does not aid the Court in following the ALJ's reasoning. *See* SSR 06-03p, 2006 WL 2329939, at *6. Therefore, the Court cannot determine whether the ALJ's assessment of Mills's opinion is supported by substantial evidence.

Peth also challenges the ALJ's decision with respect to the state agency reviewing psychiatrists. Doc. 12, p. 17. Reviewing psychiatrist Dr. Kukor opined that Peth would need flexibility in scheduling work and break periods, a limitation the ALJ acknowledged (Tr. 22) but did not specifically address. The ALJ only stated that she gave "partial" weight to Dr. Kukor's opinion (and the opinion of reviewing psychiatrist Dr. Matyi) because (1) the opinions were inconsistent with the fact that Peth attended prom, graduated high school, took a trip to the South, and attended an Anime event; and (2) failed to take into consideration Peth's "recorded response to supportive therapy services and medications since May 2016." Tr. 23. However, it does not follow that, simply because Peth could attend prom, graduate high school with accommodations, take a trip with her grandparents, and attend an Anime event, she would not need flexibility in scheduling work and break periods. That is particularly so given the episode, described above, of apparent psychosis that occurred in connection with Peth's prom attendance. Furthermore, the ALJ did not describe what "recorded response" Peth had to supportive therapy

services and medications since May 2016 anywhere in her decision.  In short, the ALJ's explanations are inadequate and the Court, therefore, is unable to determine if her decision is supported by substantial evidence.  Remand is necessary for the ALJ to sufficiently detail the evidence of record and explain her decision.

### VIII. Conclusion

For the reasons set forth herein, the Commissioner's decision is **REVERSED and REMANDED** for proceedings consistent with this opinion.[2]

IT IS SO ORDERED.

Dated: December 5, 2019

/s/ *Kathleen B. Burke*
_____
Kathleen B. Burke
United States Magistrate Judge

---

[2] This opinion should not be construed as a recommendation that, on remand, the ALJ find Peth disabled.